DAVID E. AHDOOT (SBN 245133)
dahdoot@bushgottlieb.com
KIRK M. PRESTEGARD (SBN 291942)
kprestegard@bushgottlieb.com
LUKE R. TAYLOR (SBN 338327)
ltaylor@bushgottlieb.com
BUSH GOTTLIEB
A Law Corporation
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260
Telephone:  (818) 973-3200
Facsimile:  (818) 973-3201

JEFFREY P. BENNETT (SBN 186875)
jpb@sagaftra.org
MATTHEW A. F. BLACKETT (SBN 300019)
matt.blackett@sagaftra.org
CHRISTINE A. YEROUSHALMI (SBN 321349)
christine.yeroushalmi@sagaftra.org
SAG-AFTRA
5757 Wilshire Boulevard, Floor 7
Los Angeles, CA 90036-3681
Telephone: (323) 549-6459
Facsimile: (323) 549-6445

Attorneys for Plaintiff
SAG-AFTRA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a labor organization commonly known as SAG-AFTRA,<br><br>Plaintiff,<br><br>vs.<br><br>LABC PRODUCTIONS, LLC; DIRECTV, LLC; DIRECTV HOLDINGS, LLC; DIRECTV ENTERPRISES, LLC; THE DIRECTV GROUP, INC.; AT&T SERVICES, INC.; AT&T CORP.; and AT&T ENTERTAINMENT GROUP,<br><br>Defendants. | CASE NO. 2:21-cv-09879<br><br>**COMPLAINT TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, FOR VIOLATION OF THE DIGITAL MILLENIUM COPYRIGHT ACT, BREACH OF COLLECTIVE BARGAINING AGREEMENT, UNJUST ENRICHMENT, PROMISSORY ESTOPPEL**<br><br>**[28 U.S.C. § 4001, 29 U.S.C § 185]** |

## SUMMARY OF ACTION

1.     Plaintiff Screen Actors Guild-American Federation of Television and Radio Artists ("**SAG-AFTRA**") brings this action to compel Defendants (collectively, "**AT&T**") to complete an arbitration that AT&T abandoned, after actively participating in numerous pre-hearing processes, for over two years.  Or, in the alternative, SAG-AFTRA seeks to recover the millions of dollars in compensation that AT&T is attempting to pocket, at the expense of the actors who provided the talent, long hours, and hard work critical to the creation of the popular television series *Mr. Mercedes* (the "**Series**").

2.     AT&T is bound to pay these amounts, and arbitrate any related disputes, by operation of Section 4001 of the Digital Millennium Copyright Act.  28 U.S.C. § 4001 ("**DMCA**").  Under the DMCA, a party is deemed to have assumed relevant obligations of a collective bargaining agreement when that party is transferred a copyright interest in a motion picture that it knows, or has reason to know, was produced subject to that collective bargaining agreement.  *Id*.

3.     AT&T developed the Series with Sonar Entertainment, Inc. and its production affiliates (collectively, "**Sonar**"), the acknowledged signatory to SAG-AFTRA collective bargaining agreements ("**CBA**"[1]).  Sonar and AT&T entered into a "Series Production and License Agreement" ("**Production Agreement**") through which Sonar transferred to AT&T certain copyright interests in the Series.

4.     Pursuant to the DMCA, this Production Agreement conclusively establishes AT&T's knowledge of the CBA in negotiating for that copyright transfer; e.g., AT&T required the casting of certain SAG-AFTRA-represented performers ("**Performers**"), expressly acknowledged the CBA's obligation to make exploitation-related payments to these Performers (generally, "**Residuals**"), and explicitly agreed to "enter into customary guild assumption agreements" that further

_____

[1]As more specifically defined in par. 32, *infra*.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1   confirm the Residuals obligation.

2       5.      In December 2018, as a result of the failure to pay any Residuals with

3   respect to the Series, SAG-AFTRA initiated the CBA's grievance and arbitration

4   process against AT&T and Sonar.  AT&T initially accepted responsibility for the

5   Residuals due, making numerous representations that payments would be

6   forthcoming and even making partial payments.  However, after not being able to

7   fully resolve the matter, AT&T reversed course; on October 16, 2020, SAG-AFTRA

8   and AT&T mutually selected Arbitrator Sara Adler, Esq. from the CBA's panel of

9   arbitrators to preside over the dispute.

10      6.      Over the following year, AT&T fully participated in the arbitration and,

11  without reservation, used the procedure to gain advantage, information, and undue

12  delay.  AT&T submitted to Arbitrator Adler a Cross-Complaint against co-producer

13  Sonar and a separate Counterclaim against SAG-AFTRA, obtained multiple

14  continuances of scheduled hearing dates, demanded that SAG-AFTRA respond to

15  burdensome requests for information, and frequently met with Arbitrator Adler and

16  SAG-AFTRA to present argument on a host of pre-hearing matters such as

17  scheduling, information requests, pre-hearing relief and the issues to be decided.

18  AT&T took these actions without objecting to arbitrability or otherwise challenging

19  the jurisdiction of Arbitrator Adler to preside over the dispute.

20      7.      In the end, during the entire time that AT&T and Sonar participated in

21  the grievance and arbitration process, neither party presented any argument or

22  evidence refuting the fact that the Performers were owed the Residuals.  Rather,

23  after being denied an opportunity to further delay, Sonar stipulated to the existence

24  and total amount of the Residuals due.  During the final pre-hearing conference,

25  however, in another last-minute glib maneuver, AT&T again reversed its position

26  and refused to recognize the jurisdiction of Arbitrator Adler.  In response, and over

27  SAG-AFTRA objections, Arbitrator Adler vacated the impending arbitration

28  hearings, necessitating the present action.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

8.     SAG-AFTRA brings this complaint to ensure that AT&T does not gain by its callous gamesmanship, through compelling completion of the arbitration or, in the alternative, obtaining payment of the outstanding Residuals due to the Performers.

9.     In support of this complaint, SAG-AFTRA alleges as follows:

## JURISDICTION AND VENUE

10.     Jurisdiction of this Court is based on 28 U.S.C. § 1331, because this action arises under the laws of the United States; 28 U.S.C. § 4001, because this action seeks relief under the DMCA; Section 301(c) of the Labor Management Relations Act ("**LMRA**"), 29 U.S.C. § 185(c), because SAG-AFTRA is a labor organization that maintains offices in the Central District and its duly authorized officers and agents are engaged in representing and acting on behalf of Performers throughout the Central District, including those Performers who performed services for AT&T in production of the Series; and 9 U.S.C. § 4, because this is an action to enforce an agreement to arbitrate under the LMRA and the Federal Arbitration Act; and, as applicable, 28 U.S.C. § 1367(a).

11.     Venue is proper in the Central District pursuant to LMRA Section 301(a), 29 U.S.C. § 185(a), as this is a suit brought by a labor organization for violation of a collective bargaining agreement and because the Central District has jurisdiction over SAG-AFTRA pursuant to LMRA Section 301(c), 29 U.S.C. § 185(c) and under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to SAG-AFTRA's claims occurred in the Central District.

## PARTIES

12.     SAG-AFTRA is a non-stock corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 5757 Wilshire Blvd, Los Angeles, California.

13.     SAG-AFTRA is a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act ("**NLRA**"), 29 U.S.C. § 152(5), and is the

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

duly recognized collective bargaining representative of employee Performers, including those providing services in theatrical, television and digital motion pictures, in an industry affecting commerce within the meaning of Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

14.     Defendant LABC Productions, LLC ("**LABC**") was and is a limited liability company organized under the laws of the State of California, with its principal place of business in the County of Los Angeles, California.  LABC executed the Production Agreement on behalf of AT&T and its affiliates and was to be added to Sonar's Commercial General Liability insurance covering work performed on the Series.

15.     Defendant DirecTV, LLC ("**DirecTV**") was and is a limited liability company organized under the laws of the State of California, with its principal place of business in the County of Los Angeles, California.  With respect to the Partial Payments made by AT&T, as defined in paragraphs 43, 45 and 51, *infra*, these Residuals were paid by DirecTV and "DIRECTV" was to be added to Sonar's Commercial General Liability insurance covering work performed on the Series.

16.     Defendant The DirecTV Group, Inc. ("**DTVG**") was and is a corporation organized under the laws of the State of California, with its principal place of business in the County of Los Angeles, California.  Per the Production Agreement, DTVG was to be added to Sonar's Commercial General Liability insurance covering work performed on the Series.

17.     Defendant DirecTV Holdings, LLC ("**DTVH**") was and is a limited liability company organized under the laws of the State of California, with its principal place of business in the County of Los Angeles, California.  Per the Production Agreement, DTVH was to be added to Sonar's Commercial General Liability insurance covering work performed on the Series.

18.     Defendant DirecTV Enterprises, LLC ("**DTVE**") was and is a limited liability company organized under the laws of the State of California, with its

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

principal place of business in the County of Los Angeles, California. Per the Production Agreement, DTVE was to be added to Sonar's Commercial General Liability insurance covering work performed on the Series.

19. Defendant AT&T Services, Inc. ("**AT&T Services**") was and is a corporation organized under the laws of the State of Delaware, with its principal place of business in Dallas, Texas, and transacting business in the County of Los Angeles, California. A representative of AT&T Services responded to SAG-AFTRA's initial claim for unpaid Residuals, as described in par. 40, *infra.*

20. Defendant AT&T Corp. ("**AT&T Corp.**") was and is a corporation organized under the laws of the State of New York, with its principal place of business in Bedminster, New Jersey, and transacting business in the County of Los Angeles, California. Based on public records, through merger, AT&T Corp. absorbed the entity that utilized AT&T Entertainment Group as a trade name, at all times relevant to the Series.

21. Defendant AT&T Entertainment Group ("**AT&T Entertainment**") is a division within the AT&T corporate family, located in the County of Los Angeles, and is responsible for, among other things, providing video entertainment services through both linear and streaming platforms. On information and belief, and at all times material herein, AT&T Entertainment encompassed all other Defendants, operatively marking them as a common enterprise to the extent of their mutual and overlapping involvement in the production and exhibition of the Series.

22. Pursuant to the terms of the Production Agreement, and based on AT&T's conduct in response to the grievance arbitration process preceding this action, and on information and belief when applicable, Defendants LABC, DirecTV, DTVG, DTVH, DTVE, AT&T Services, AT&T Corp., and AT&T Entertainment, collectively, are the central entities and/or divisions in the AT&T corporate family that were involved in the production, financing and domestic exploitation of the Series. SAG-AFTRA has issued requests for information and/or subpoenas *duces*

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Case No. 2:21-cv-09879

1  *tecum* focused on the relationship among the Defendants, its other affiliated entities,

2  and the Series, which remain outstanding.  To the extent necessary, SAG-AFTRA

3  reserves the right to name additional AT&T-related entities according to proof.

4      23.  As set forth in paragraphs 37, 95-102, *infra*, because Sonar granted to

5  "LABC and its Affiliates" the exclusive right and license to distribute the Series, or

6  to permit distribution and other exploitation of the Series, and because the

7  Production Agreement defines "Affiliate" as "any corporation, person, or entity

8  controlling, controlled by or under common control with LABC," by operation of

9  the DMCA, 28 U.S.C. § 4001, all Defendants are subject to the CBA and the

10  remedies set forth therein, equally.

11      24.  Separately, SAG-AFTRA is informed and believes and thereon alleges

12  that at all times relevant herein, with respect to the Series, Defendants operated as a

13  single employer and single-integrated business enterprise within the meaning of the

14  NLRA and based on the factors established by the National Labor Relations Board

15  to determine whether two or more distinct business entities should be treated as a

16  single employer.  In particular, with respect to the Series and at all relevant times,

17  Defendants had interrelated operations, common management, centralized control of

18  labor relations, and common ownership.  *See NLRB v. Big Bear Supermarkets,* 640

19  F.2d 924, 928 (9th Cir. 1980); *Rockwood Energy and Mineral Corp.,* 299 NLRB

20  1136, 1139 (1990), *enf'd* 942 F.2d 169 (3d Cir. 1993).  At all relevant times, with

21  respect to the Series, Defendants have been affiliated business enterprises with

22  common officers, ownership, directors, management, and supervision; have shared

23  common premises and facilities; have provided services for and made sales to each

24  other; have interchanged personnel with each other; have had interrelated

25  operations; and have held themselves out to the public as a single integrated

26  business enterprise, doing business as the AT&T Entertainment Group or AT&T.

27      25.  Accordingly, with respect to the Series, each Defendant is jointly and

28  severally liable for the actions of each other Defendant such that all Defendants

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1   should be treated as a single entity and/or common enterprise for purposes of this

2   action.

### THE DMCA

### (28 U.S.C. § 4001)

5       26.     In relevant part, as defined herein, the DMCA provides that, "in the

6   case of a transfer of copyright ownership under United States law in a motion

7   picture," a non-signatory to a collective bargaining agreement may be deemed to

8   have assumed the obligation to make residuals payments in connection with the

9   exploitation of the motion picture if the transferee "knows or has reason to know at

10  the time of the transfer that such collective bargaining agreement was or will be

11  applicable to the motion picture."  28 U.S.C. § 4001(a)(1).

12      27.     Subject to congressional oversight and approval, the DMCA was

13  negotiated among the Alliance of Motion Picture and Television Producers (as the

14  trade representative of the producers), the American Film Marketing Association,

15  SAG-AFTRA (as successor to the Screen Actors Guild, Inc.), the Directors Guild of

16  America, Inc., and other trade groups, including representatives for film financiers

17  and cable television exhibitors, to address the problem of Residuals going unpaid

18  when producers failed to obtain documentation required by collective bargaining

19  agreements, designed to ensure that licensees satisfy Residual obligations payable to

20  Guild-represented talent that accrue upon licensee exploitation of Guild-covered

21  product.  *See Screen Actors Guild, Inc. v. Smoke Tree Prods., LLC*, No. CV 09-1472

22  CBM (JCX), 2011 WL 13272696, at *8 & n.3 (C.D. Cal. Jan. 6, 2011); *see also Am.*

23  *Fed'n of Musicians of the United States & Canada v. Rural Media Grp., Inc.*, No.

24  3:20-CV-00318, 2021 WL 848699, at *3-4 (M.D. Tenn. Mar. 5, 2021).

25      28.     Under the DMCA, the transfer instrument itself (e.g., a co-production,

26  license, and/or distribution agreement) "shall be deemed to incorporate the

27  assumption agreements applicable to the copyright ownership being transferred that

28  are required by the applicable collective bargaining agreement," and the transferee

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

"shall be subject to the obligations under each such assumption agreement to make residuals payments and provide related notices, accruing after the effective date of the transfer and applicable to the exploitation of the rights transferred, and any remedies under each such assumption agreement for breach of those obligations, as those obligations and remedies are set forth in the applicable collective bargaining agreement."  28 U.S.C. § 4001(a)(1).

29.   In relevant part, "knows or has reason to know" means "[a]ctual knowledge that the collective bargaining agreement was or will be applicable to the motion picture," "[c]onstructive knowledge that the collective bargaining agreement was or will be applicable to the motion picture," or "[a]wareness of other facts and circumstances pertaining to a particular transfer from which it is apparent that the collective bargaining agreement was or will be applicable to the motion picture.  28 U.S.C. § 4001(a)(2)(A)-(C).

30.   For purposes of applying 28 U.S.C. § 4001, a "transfer of copyright ownership" is "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."  17 U.S.C. § 101.

31.   There is no exclusion under the DMCA for a "terrestrial broadcast station, cable system, or programmer, or other transferee" that is also "functioning otherwise as a distributor or as a producer of the motion picture."  28 U.S.C. § 4001(b).

## ARBITRATION PROVISIONS IN THE
## COLLECTIVE BARGAINING AGREEMENT

32.   SAG-AFTRA and entertainment industry companies, including producers and distributors (as defined in the CBA, collectively, "**Producers**"), enter into various collective bargaining agreements establishing the terms and conditions of performer employment.  More specifically, and as relevant here, the CBA

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1   includes the Producer-SAG-AFTRA Codified Basic Agreement of 2014 (the "**BA**")

2   and the 2014 SAG-AFTRA Television Agreement ("**TVA**"), as both were amended

3   by the 2017 Memorandum of Agreement Between The Screen Actors Guild-

4   American Federation of Television and Radio Artists and The Alliance of Motion

5   Picture and Television Producers.  The BA establishes the basic terms and

6   conditions of performer employment in the industry, while the TVA is more

7   specifically applicable to motion pictures that are made for television exhibition.

8   While the TVA refers back to the BA in part, the primary collective bargaining

9   agreement relevant to this action is the TVA because the Series was made for initial

10   exhibition in the television market.

11       33.   Section 50 of the TVA sets forth the grievance and arbitration

12   procedure and broadly establishes that "[a]ll disputes between the Union and a

13   Producer as to the interpretation of this collective bargaining agreement shall be

14   arbitrable."  A true and correct copy of Section 50 of the TVA, which is operative at

15   all times relevant hereto, is attached as Exhibit A.

16       34.   Section 50(f) states that a grievance is initiated by a claim and

17   reconciliation process in which the parties are afforded an opportunity to conciliate

18   the dispute prior to a formal demand for arbitration being made.  TVA, Exhibit A,

19   pp. 39-40.  If that reconciliation process fails to resolve the claim, the union or the

20   Producer issues a written demand for arbitration "setting forth the material facts

21   concerning the dispute." *Id.* at Sec. 50(f)(3), p. 40.  The parties are then instructed to

22   select an arbitrator and move the matter to hearing.  *Id.* at Sec. 50(f)(3), pp. 41.

23       35.   Section 21 of the TVA, entitled "Responsibility for Payment of

24   Residuals – Distributor's Liability and Producer's Liability," provides that

25   Producers are required to obtain a "Television Distributor's Assumption

26   Agreement" ("**DAA**") from all distributors with the right to distribute covered

27   motion pictures on free television, basic cable, foreign television exhibition,

28   theatrical exhibition or in supplement markets.  A true and correct copy of Section

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

21 of the TVA, which includes the form DAA and is operative at all times relevant hereto, is attached as Exhibit B.

36.     The DAA incorporates the arbitration provisions contained in the TVA, and states that "all disputes based upon, arising out of or relating to this Assumption Agreement, other than SAG-AFTRA's entitlement to injunctive or other equitable relief, shall be submitted to final and binding arbitration in accordance with the arbitration provisions contained in the Television Agreement." *See* Exhibit B, p. 55.

## FACTS COMMON TO ALL CLAIMS

### A.     AT&T's Production, Financing and Distribution of the Series

37.     On December 20, 2016, AT&T and Sonar entered into the Production Agreement, establishing the terms and conditions for the production, financing, and distribution of the Series.

38.     The Production Agreement includes the following relevant provisions:

- "LABC **and its Affiliates** are…granted the exclusive right and licenses…to distribute…and to permit distribution and other exploitation…" of the Series, in numerous methods of transmission, including, *inter alia*, linear television, free video on demand, subscription video on demand, advertiser supported video on demand, electronic sell-through, "including, without [further] limitation, the exclusive worldwide premiere rights for each episode of the [S]eries" (*emphasis added*) (collectively, as more fully defined in the Production Agreement including limitations on territory and term, the "**Telecast Rights**").

- "LABC shall enter into customary guild assumption agreements…" and, further, specific discussion between Sonar and AT&T with respect to the "Guild Payment Obligations," conclusively evincing AT&T's knowledge that the Series was produced subject to a collective bargaining agreement.

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

- ▪ "Affiliate" is defined as "any corporation, person, or entity controlling, controlled by or under common control with LABC," and expressly includes reference to "LABC or its affiliates, AT&T and DIRECTV…," among others.

- ▪ "LABC (or its designee) shall be accorded sole opening 'Presented By' credit substantially in the form "Audience Network Presents an AT&T Original Series…"

- ▪ AT&T's approval "of the lead actor portraying the role of *Bill Hodges* for the Series…" among other significant approval rights over the conditions of production and specifications of Series characteristics.

- ▪ AT&T's retention of an ongoing, worldwide financial interest in the exhibition of the Series, in perpetuity, calculated by different percentages of adjusted domestic and foreign gross receipts.

39.     In accordance with the Production Agreement, AT&T exercised hands-on, direct control over many aspects of the terms and conditions of employment of the Performers, including, *inter alia*, making casting decisions, managing shoot schedules, making marketing decisions, controlling press releases, controlling visual and creative elements, and controlling production credit and branding.

40.     From approximately December 2016 to approximately May 2020, and in accordance with the Production Agreement and subsequent amendments and related agreements, AT&T maintained the exclusive Telecast Rights from Sonar -- an acknowledged CBA signatory -- and with knowledge of the Residuals obligations due to the Performers who worked on the Series pursuant to the CBA, causing the exploitation of the Series in the domestic Basic Cable and Ad-Supported-Streaming/Over-The-Top markets through its channel, Audience Network.

**B.     AT&T's Response to the Claim (Prior To Arbitrator Selection)**

41.     On December 18, 2018, SAG-AFTRA sent a Statement of Claim and Request for Conciliation ("**Claim**") to Sonar and AT&T (through Audience

Network), seeking written reports and payment of Residuals required under the CBA.  The Senior Manager of Programming and Development for Audience Network and AT&T Services responded to the Claim by acknowledging receipt and further stating that AT&T "wanted to find out more about what is due so we can get this resolved."  During the initial conciliation period, AT&T acknowledged the Residuals obligation and made repeated assurances that payment would be forthcoming.

42.     Since Residuals were not received, on October 15, 2019, SAG-AFTRA served AT&T with its Statement of Claim and Demand for Arbitration ("**Demand**").

43.     On December 10, 2019, after issuance of the Demand, AT&T caused a partial payment to be made to SAG-AFTRA, on behalf of the Performers, in the amount of $84,960.98 ("**First Partial Payment**").

44.     While Residual payments are submitted to SAG-AFTRA for handling, the CBA requires that the payments be made directly to individual Performers.  To handle the complexities of these employee payment obligations, studios routinely use third party payroll companies that prepare per-performer payments and necessary union reporting.  On December 11, 2019, AT&T informed SAG-AFTRA that it had engaged Entertainment Partners, a common entertainment industry payroll company (the "**Payroll Company**"), to process the Residuals payments with respect to the Series.

45.     On December 20, 2019, AT&T caused a second payment to be made to SAG-AFTRA, on behalf of the Performers, in the amount of $23,004.59 ("**Second Partial Payment**").

46.     On February 13, 2020, AT&T informed SAG-AFTRA that their new point of contact would be the Head of Current Programming and Production within the AT&T Entertainment Group.  Through this representative, via email, AT&T continued to make assurances to SAG-AFTRA that payment would be forthcoming, representing that the delay was the fault of the Payroll Company.  AT&T further

Busch Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

inquired, via email, as to the best way "to estimate potential [R]esiduals that would be due if [AT&T] decided to exploit SVOD rights of past and present seasons **of some of our scripted series (i.e., Mr. Mercedes…)**" (emphasis added).

47. Since AT&T had not yet satisfied its acknowledged obligation, on July 28, 2020, via email, SAG-AFTRA requested that AT&T meet and confer for the purpose of selecting an arbitrator.

48. On or around August 6, 2020, AT&T asked SAG-AFTRA to delay arbitrator selection, stating in an email that AT&T was "right at the goal line" for paying Residuals for the Series.

49. On September 3, 2020, Sonar provided a copy of the Production Agreement to SAG-AFTRA, revealing for the first time the extent of AT&T's direct role in the production, financing and distribution of the Series.

50. As a result, on September 23, 2020, SAG-AFTRA served AT&T with a First Amended Statement of Claim and Demand for Arbitration ("**Amended Demand**"), naming the additional AT&T entities identified in the Production Agreement, who, on information and belief, were also involved in the production, financing and distribution of the Series.  As a courtesy, SAG-AFTRA allowed AT&T additional time to consider and participate in arbitrator selection.

51. On October 12, 2020, AT&T caused a third payment to be made to SAG-AFTRA, on behalf of the Performers, in the amount of $584,421.55 ("**Third Partial Payment**") (collectively, with the First and Second Partial Payments, the "**Partial Payments**").

52. The Partial Payments represent the total amount paid to SAG-AFTRA by AT&T with respect to its co-production, financing and distribution of the Series.

53. On October 16, 2020, AT&T and SAG-AFTRA mutually selected Arbitrator Sara Adler to preside over the dispute, subject to all applicable AT&T reservations.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

**C.     AT&T's Response to the Claim (After Arbitrator Selection)**

54.     On October 28, 2020, SAG-AFTRA sent Arbitrator Adler correspondence confirming her selection by the parties and requesting hearing dates in February 2021.

55.     On November 12, 2020, AT&T confirmed its availability to arbitrate the dispute on February 15, 16 and 17, 2021.  In setting these hearing dates, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

56.     On December 9, 2020, SAG-AFTRA issued to AT&T requests for information pursuant to the NLRA, which requires employers to provide information relevant to employees' terms and conditions of employment.

57.     On December 15, 2020, AT&T requested via email that SAG-AFTRA agree to hold a scheduling conference with Arbitrator Adler.

58.     On December 16, 2020, SAG-AFTRA sent notice to AT&T and Sonar confirming receipt of all Partial Payments and advising that such amounts would be processed and paid to the Performers in the normal course ("**Distribution Notice**"), while simultaneously advising that SAG-AFTRA reserved all rights with respect to any unsatisfied portions of the Claim.  Neither Sonar nor AT&T responded to the Distribution Notice.

59.     On December 21, 2020, AT&T and SAG-AFTRA met and conferred to discuss pre-hearing conferences and SAG-AFTRA's NLRA-based requests for information.

60.     On January 12, 2021, Arbitrator Adler approved SAG-AFTRA's request to issue arbitration subpoenas *duces tecum* to AT&T and Sonar, and scheduled a pre-hearing conference for January 29, 2021.

61.     On January 13, 2021, AT&T sent SAG-AFTRA its "Responses and Objections to SAG-AFTRA's Document Information Requests."  In these responses, AT&T did not object to its obligation to provide information pursuant to

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

the NLRA, nor did AT&T object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

62.     On January 26, 2021, AT&T requested that Arbitrator Adler continue the hearing scheduled for February 15, 16, and 17, 2021, for at least 90 days.  In this written request, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

63.     On January 28, 2021, SAG-AFTRA sent Arbitrator Adler and all parties to the arbitration correspondence opposing AT&T's request to continue the hearing.

64.     At a pre-hearing conference held on January 29, 2021, Sonar orally joined AT&T's request for a continuance.  After hearing argument from AT&T, Sonar, and SAG-AFTRA, and considering the papers, Arbitrator Adler issued the following ruling:

- "…I am granting the request of the AT&T parties and denying the request of the Sonar parties.
- The hearing scheduled for 2/15/21 will go forward at 10 a.m. PDT on SAG's claims against the Sonar parties.  It seems unlikely that the hearing will take more than one day, but I am not releasing the scheduled date of 2/16/21 as a failsafe.
- The AT&T parties are permitted to attend the hearing on 2/15/21.
- The AT&T parties are ordered to submit any counter claims/cross claims on or before 2/15/21.
- SAG and the AT&T parties are ordered to select one of the following dates for a hearing on the disputes between them – April 1, 16, 26-28 or 30, 2021.
- If there are disputes solely between the AT&T parties and the Sonar

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

parties subject to my jurisdiction, they will be scheduled after 2/15/21." During this pre-hearing conference, and on receipt of Arbitrator Adler's ruling, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

65. As of February 8, 2021, AT&T had not yet confirmed availability for hearing dates in April 2021, and represented via email that "[r]espondent and counter-claimant LABC is confirming availability of witnesses and will have an answer to you on dates by tomorrow." During this scheduling process, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

66. On or around February 12, 2021, Sonar and SAG-AFTRA reached an agreement concerning the Claim ("**Stipulated Sonar Award**"). In this agreement, Sonar stipulated to, *inter alia*, its signatory relationship with SAG-AFTRA, that the Series was produced subject to the CBA, and that the total amount of Residuals and related amounts due was $4,965,583.40 (as of the fourth quarter of 2019, less the Partial Payments). SAG-AFTRA and Sonar jointly submitted the Stipulated Sonar Award to Arbitrator Adler, with a copy to AT&T.

67. On that same date, SAG-AFTRA also requested that Arbitrator Adler assist in scheduling the AT&T hearing because AT&T had not yet confirmed any of the dates Arbitrator Adler proposed in her January 29 ruling. Given AT&T's delay in responding, Arbitrator Adler informed the parties that she no longer had availability for the proposed April hearing, and offered dates in May 2021. SAG-AFTRA immediately confirmed its availability for a hearing in May, and requested a prompt response from AT&T.

68. On February 15, 2021, Arbitrator Adler executed and entered the Stipulated Sonar Award.

69. Also on February 15, 2021, AT&T submitted its Answer, Defenses,

and Counter-Claim against SAG-AFTRA ("**Answer and Counter-Claim**"[2]) and separately, its  Cross-Complaint against Sonar ("**Cross-Complaint**").  Attached as Exhibit C, is a true, correct and complete copy of the Answer and Counter-Claim, and, as Exhibit D, a true, correct and complete copy of the Cross-Complaint.  In submitting the Cross-Complaint to Arbitrator Adler, AT&T did not object to the arbitrability of the Claim, present any reservation, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.  In separately submitting the Answer and Counter-Claim, AT&T did not object to the arbitrability of the Claim, present any reservations,[3] or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

70.    On February 19, 2021, AT&T asked to further delay arbitration until July or August 2021.  As a courtesy, and in light of the Sonar Stipulated Award, SAG-AFTRA did not oppose the continuance request, but also flagged apparent misrepresentations in the Answer and Counter-Claim, including, *inter-alia*, an allegation that "AT&T informed SAG-AFTRA of the mistaken payment and demanded return of the [Partial Payments].  AT&T also sent the Guild a letter, explaining the situation and demanding repayment of the [Partial Payments].  The Guild refused" ("**AT&T's Alleged Written Demand**").

71.    Citing witness availability, AT&T next sought to continue the hearing until September 2021.  On March 1, 2021, on Arbitrator Adler's suggestion, the

---

[2]While AT&T is entitled to assert any appropriate affirmative defense, AT&T has no basis to submit a "Counter-Claim" against SAG-AFTRA under the terms of the CBA.  SAG-AFTRA reserves all rights with respect to AT&T's Answer and Counter-Claim.

[3]Among the numerous boiler-plate defenses AT&T submitted to Arbitrator Adler pursuant to the January 29, 2021 order, AT&T challenged the operation of the DMCA as a basis to assert that "the Guild lacks jurisdiction over AT&T." Nevertheless, without reservation, AT&T submitted even this defense against the operation of the DMCA to Arbitrator Adler for determination.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1  parties agreed to hold a pre-hearing conference on April 28, 2021, and scheduled
2  substantive hearing days on September 8 and 9, 2021.  During this scheduling
3  process AT&T did not object to the arbitrability of the Claim, present any
4  reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside
5  over the dispute.

6      72.    On April 16, 2021, in advance of the April 28 pre-hearing conference,
7  SAG-AFTRA submitted papers objecting to aspects of the AT&T Counter-Claim,
8  including AT&T's Alleged Written Demand ("**Motion to Dismiss**"), and separately,
9  AT&T's failure to produce documents in response to the arbitration subpoenas.

10      73.    AT&T and SAG-AFTRA participated in a pre-hearing conference on
11  April 28, 2021.  After hearing argument on the Motion to Dismiss and the status of
12  the subpoenas, Arbitrator Adler ordered that, a) on or before May 5, 2021, AT&T
13  was to produce a copy of AT&T's Alleged Written Demand; b) the parties were to
14  immediately meet and confer with respect to AT&T's failure to produce documents
15  responsive to the subpoenas; and c) the parties were to attend another pre-hearing
16  conference on August 6, 2021.  At the April 28 pre-hearing conference, AT&T did
17  not object to the arbitrability of the Claim, present any reservations, or otherwise
18  challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

19      74.    AT&T repeatedly failed to produce a copy of AT&T's Alleged Written
20  Demand, so, on May 17, 2021, Arbitrator Adler scheduled another pre-hearing
21  conference to be held on May 25, 2021, for the purpose of addressing the issue.

22      75.    On May 21, 2021, as a consequence of insolvency, Sonar initiated a
23  General Assignment for the Benefit of Creditors to liquidate all of its remaining
24  assets.  Pursuant to this General Assignment, Sonar transferred ownership of all its
25  rights in tangible and intangible assets to the assignee for liquidation.

26      76.    On the morning of May 25, 2021, just prior to the pre-hearing
27  conference, AT&T produced to SAG-AFTRA emails to its Payroll Company
28  concerning the Third Partial Payment, but failed to produce AT&T's Alleged

Written Demand.  In producing the correspondence with the Payroll Company, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

77.     At the May 25 pre-hearing conference, Arbitrator Adler noted AT&T's failure to produce a copy of AT&T's Alleged Written Demand and ordered the parties to meet and confer within one week.  Arbitrator Adler further ordered the parties to submit a report concerning the outcome of the meet and confer to determine if a procedure was necessary to address these issues.  At the May 25 prehearing conference, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

78.     AT&T and SAG-AFTRA exchanged meet and confer correspondence on May 28, June 1, and June 11, 2021, with respect to outstanding subpoena issues; however, AT&T continued to fail to produce a copy of AT&T's Alleged Written Demand.  In these "meet and confer" discussions and related correspondence, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

79.     On June 8, 2021, AT&T served SAG-AFTRA with a "Request for Information and Documents" ("**AT&T RFI**"), demanding that SAG-AFTRA respond to numerous requests for information.  In the AT&T RFI, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

80.     In an email sent to Arbitrator Adler on June 16, 2021 (in an entry marked "Action Item c."), SAG-AFTRA requested that:

"1) An adverse inference be drawn that AT&T did not send SAG-AFTRA any written demand for repayment; and 2) During [the] presently scheduled pre-hearing conference…AT&T be Ordered to Show Cause as to why it's Counter-Claim should not be stricken given the legal argument and evidence

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

submitted by SAG-AFTRA and the absence of any writings supporting AT&T's claims…"

SAG-AFTRA further requested "that AT&T be ordered to submit written support for its position by Friday, July 23, 2021, and that SAG-AFTRA have an opportunity to respond by Friday, July 30, 2021."

81.     On June 19, 2021, Arbitrator Adler ordered as follows:

"I view Action Item c…as essentially a Motion to Dismiss and hereby adopt [SAG-AFTRA's] proposed schedule. The August 6 session will be open to any items that need to be discussed by either party."

82.     On July 7, 2021, AT&T and SAG-AFTRA executed a Confidentiality Agreement with respect to documents produced in the arbitration.  AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitration Adler to preside over the dispute in entering into the Confidentiality Agreement.

83.     On July 7, 2021, AT&T made a partial production of requested information, but the production consisted entirely of records from the Payroll Company.  AT&T represented that they intended to complete the balance of the production on July 19.  In making this partial production, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

84.     On July 8, 2021, SAG-AFTRA responded to the AT&T RFI, objecting to the entirety of the requests as, *inter alia*, impermissible and unenforceable in a labor arbitration.  Without waiver, and to ensure that the arbitration hearings were not again continued, SAG-AFTRA voluntarily committed to producing certain responsive records.

85.     On July 29, 2021, AT&T transmitted a document production that was voluminous, yet incomplete and often irrelevant, comprising over 40,000 pages.  In making this partial production, AT&T did not produce a copy of AT&T's Alleged

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1   Written Demand, nor did AT&T object to the arbitrability of the Claim, present any

2   reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside

3   over the dispute.

4         86.    On July 29, 2021, SAG-AFTRA submitted a Reply in Support of

5   Motion to Dismiss, as well as a letter updating Arbitrator Adler on the status of

6   AT&T's response to the subpoenas.

7         87.    On July 30, 2021, SAG-AFTRA made its first partial production in

8   response to the AT&T RFI.

9         88.    On August 5, 2021, AT&T submitted untimely written argument to

10  Arbitrator Adler, via email, opposing the Motion to Dismiss solely on procedural

11  grounds.  AT&T did not produce a copy of AT&T's Alleged Written Demand, nor

12  reassert that any such writing existed.  Further, AT&T did not object to the

13  arbitrability of the Claim, present any reservations, or otherwise challenge the

14  jurisdiction of Arbitrator Adler to preside over the dispute.

15        89.    On August 6, 2021, AT&T and SAG-AFTRA appeared before

16  Arbitrator Adler to address the Motion to Dismiss, the subpoenas, and certain

17  procedural stipulations proposed by SAG-AFTRA.  During this hearing, AT&T

18  requested another continuance of the hearing (in light of religious holidays).  After

19  hearing argument from SAG-AFTRA and AT&T, Arbitrator Adler agreed to

20  reschedule the hearing subject to SAG-AFTRA's availability, ordered the parties to

21  meet, confer and close procedural stipulations proposed by SAG-AFTRA, and did

22  not grant pre-hearing relief with respect to the Motion to Dismiss.  AT&T did not

23  object to the arbitrability of the Claim, present any reservations, or otherwise

24  challenge the jurisdiction of Arbitrator Adler to preside over the dispute during the

25  August 6 pre-hearing conference.

26        90.    On August 7, 2021, Arbitrator Adler rescheduled the arbitration hearing

27  for November 3 and 5, 2021, and ordered the parties to appear at a pre-hearing

28  conference on September 14, 2021.

**D.     AT&T's Refusal to Recognize the Jurisdiction of the Arbitrator**

91.     Pursuant to Arbitrator Adler's order, on August 18, 2021, AT&T sent SAG-AFTRA a redlined document reflecting substantial changes to proposed procedural stipulations.  Also, on August 18, 2021, AT&T made a third, incomplete, production of documents.  In producing these materials, AT&T did not object to the arbitrability of the Claim, present any reservations, or otherwise challenge the jurisdiction of Arbitrator Adler to preside over the dispute.

92.     SAG-AFTRA noted that AT&T had refused to stipulate that "[i]n the event of a remedy, Arbitrator Adler [would] retain[] jurisdiction over any disputes regarding that remedy."  During a subsequent meet and confer discussion, SAG-AFTRA inquired about this change, and AT&T represented that it was evaluating whether or not it disputed Arbitrator Adler's jurisdiction over the dispute.  On September 9, 2021, SAG-AFTRA requested via email that AT&T confirm its position on arbitrability; AT&T never responded.

93.     In light of these ongoing discussions between the parties, on September 12, 2021, Arbitrator Adler rescheduled the September 14 final, pre-hearing conference to October 4, 2021.

94.     On September 27, 2021, SAG-AFTRA produced additional records responsive to the AT&T RFI.

95.     During the final, pre-hearing conference, on October 4, 2021, AT&T asserted that Arbitrator Adler did not have jurisdiction over the dispute between the parties and that this issue must be decided by a federal court.  Pending a judicial determination as to whether the dispute is arbitrable, Arbitrator Adler vacated the November hearing dates.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

## FIRST CLAIM FOR RELIEF

## TO COMPEL ARBITRATION

## UNDER THE DMCA (28 U.S.C. § 4001)

(Against all Defendants)

96.     SAG-AFTRA incorporates paragraphs 1 through 95 as if expressly set forth herein.

97.     The Production Agreement, which gave AT&T the exclusive right and license to distribute and permit distribution and other exploitation of the Series in the domestic markets for a specified term, is a "transfer of copyright ownership" pursuant to the DMCA.  28 U.S.C. § 4001(a); 17 U.S.C. § 101.

98.     Per the express terms of the Production Agreement, AT&T "knew or should have known" at the time of the transfer that the Series was or would be produced subject to the CBA, including the obligation to pay Residuals to Performers in connection with exploitation of the Series.  28 U.S.C. § 4001(a)(2).

99.     The CBA requires an executed DAA from a company that obtains the right to distribute a motion picture, in the form contained in the CBA, made expressly for the benefit of SAG-AFTRA as representative of the Performers and by which, *inter alia*, that company agrees to assume and pay Residuals owed in connection with its exploitation of the picture.  Exhibit B.

100.    Pursuant to and by operation of the DMCA, AT&T is deemed to have assumed and become responsible for the Guild obligations specified therein, and is subject to the remedies for breach of such obligations as set forth in the CBA.

101.    AT&T is subject to both the obligation to pay Residuals and to the arbitration provisions set forth in CBA.  The dispute about the extent to which AT&T is liable for Residuals in connection with its exploitation of the Series is a dispute concerning interpretation of the CBA.

102.    Despite the obligation to arbitrate and after months of engagement and recourse to the CBA's arbitration process, AT&T now refuses to submit to the

1   jurisdiction of the arbitrator to resolve the dispute.

2       103.   Under the circumstances of this case, AT&T has no valid basis for

3   failing and refusing to recognize the operation of the DMCA and/or to refuse to

4   continue the arbitration process to address any reasonable dispute between the

5   parties with respect to the Series and the obligations imposed by the CBA.  The

6   Court should therefore compel the arbitration of this dispute and award SAG-

7   AFTRA reasonable attorneys' fee pursuant to the DMCA, in amounts according to

8   proof.  28 U.S.C. § 4001(g).

9                    **SECOND CLAIM FOR RELIEF**

10   **TO COMPEL ARBITRATION UNDER LMRA § 301 (29 U.S.C. §185)**

11                    (Against all Defendants)

12       104.   SAG-AFTRA incorporates paragraphs 1 through 103 as if expressly set

13   forth herein.

14       105.   The CBA is a labor-management agreement governed by LMRA § 301,

15   29 U.S.C. § 185.

16       106.   The dispute over the extent to which AT&T is liable for Residuals in

17   connection with its exploitation of the Series, and in what amounts, is a dispute that

18   is based upon, arising out of, or relating to the CBA, and must be arbitrated.

19       107.   By operation of the DMCA, and by its conduct and/or by express

20   incorporation by reference in the Production Agreement, AT&T assumed the

21   Residuals obligation imposed by the CBA and the concomitant requirement that all

22   disputes related to the CBA must be submitted to arbitration, and AT&T's refusal to

23   arbitrate constitutes a breach of AT&T's obligations under the CBA.

24       108.   AT&T also became obligated to arbitrate disputes over payment of

25   Residuals by availing itself of the benefits of, and directly benefiting from, the

26   services provided by the Performers covered by the CBA while having knowledge

27   that such services were subject to the obligations of the CBA.

28       109.   AT&T also became obligated to arbitrate disputes in accordance with

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Case No.  2:21-cv-09879

the CBA, or waived any objection to same, through its conduct subsequent to SAG-AFTRA's issuance of the Claim – manifesting a clear intent to be bound by the relevant provisions of the CBA – when AT&T, *inter alia*, made assurances that it would satisfy its Residuals obligation, paid and processed certain Residuals and late fee damages pursuant to the CBA, submitted reporting on such payments pursuant to the CBA, and submitted the dispute to the jurisdiction of the arbitrator through its recourse to the arbitration process.

110.    Under the circumstances of this case, AT&T has no valid basis for failing and refusing to continue the arbitration process to address any reasonable dispute between the parties with respect to the Series and the obligations of the CBA.  Indeed, after its extensive participation in the arbitration process for more than one year, AT&T's late-asserted refusal to recognize the jurisdiction of the arbitrator is in bad faith.  The Court should therefore compel the arbitration of this dispute and award SAG-AFTRA reasonable attorneys' fees pursuant to the LMRA, in amounts according to proof.  *See, e.g.*, *United Food & Com. Workers Union, Locs. 197 et al v. Alpha Beta Co.*, 736 F.2d 1371, 1383 (9th Cir. 1984).

## THIRD CLAIM FOR RELIEF

## FOR DAMAGES FOR VIOLATION OF THE DMCA (28 U.S.C. § 4001)

(Against all Defendants)

111.   SAG-AFTRA incorporates paragraphs 1 through 110 as if expressly set forth herein.

112.   AT&T has failed to pay the full amount of Residuals owed pursuant to the CBA to the Performers in connection with the Series and the rights it acquired through the Production Agreement.

113.   AT&T's refusal to pay such Residuals owed to the Performers is a violation of the DMCA.

114.   Accordingly, AT&T owes additional amounts to the Performers in amounts according to proof.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

115.   Under the circumstances of this case, AT&T has no valid basis for failing and refusing to recognize the operation of the DMCA.  In addition to all other relief requested herein, the Court should therefore award SAG-AFTRA reasonable attorneys' fees pursuant to the DMCA, in amounts according to proof. 28 U.S.C. § 4001(g).

**FOURTH CLAIM FOR RELIEF**

**FOR DAMAGES FOR BREACH OF THE CBA,**

**LMRA § 301 (29 U.S.C. § 185)**

(Against all Defendants)

116.   SAG-AFTRA incorporates paragraphs 1 through 115 as if expressly set forth herein.

117.   The LMRA empowers this Court to enforce the CBA against AT&T because AT&T is an employer engaged in industries affecting commerce, and because AT&T is bound by provisions of the CBA relating to payment of Residuals. AT&T has failed to pay the full amount of Residuals owed to the Performers in connection with the Series and the rights it acquired through the Production Agreement.

118.   AT&T's refusal to pay such Residuals owed to the Performers is a breach of the CBA.

119.   Accordingly, AT&T owes additional amounts to the Performers in amounts according to proof.

**FIFTH CLAIM FOR RELIEF**

**FOR DAMAGES ARISING FROM PROMISSORY ESTOPPEL**

(Against all Defendants)

120.   SAG-AFTRA incorporates paragraphs 1 through 119 as if expressly set forth herein.

121.   AT&T made repeated promises that it would comply with the applicable terms of the CBA with respect to the Series, confirming that it was

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

engaging the Payroll Company to satisfy its outstanding obligations, and specifically requesting that SAG-AFTRA delay arbitration to provide AT&T with an opportunity to satisfy its outstanding obligations.  Further, to support its promises that payment would be forthcoming, AT&T partially complied with its obligations under the terms of the CBA by making the Partial Payments and submitting Residuals-related reporting.

122.    AT&T failed to pay the full amount of Residuals owed to the Performers in connection with the Series and the rights it acquired through the Production Agreement.

123.    SAG-AFTRA reasonably relied on AT&T's promises and related conduct.

124.    AT&T knew or should have known that SAG-AFTRA would reasonably be induced to rely on AT&T's promises.

125.     SAG-AFTRA's reliance on AT&T's representations was detrimental, *inter alia,* because Sonar, AT&T's co-producer and co-respondent in the grievance and arbitration process, became insolvent and was unable to satisfy its intersecting obligations under the CBA with respect to the Series.

126.    Accordingly, AT&T should be estopped from withholding the additional Residuals due and related damages under the CBA, in amounts according to proof.

### SIXTH CLAIM FOR RELIEF
### FOR RESTITUTION UNDER QUASI-CONTRACT
### OR UNJUST ENRICHMENT
(Against all Defendants)

127.    SAG-AFTRA incorporates paragraphs 1 through 126 as if expressly set forth herein.

128.    In the Production Agreement, AT&T contracted for the production of the Series under certain terms and conditions, including, *inter alia*, control over

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

casting the Performers.

129.   SAG-AFTRA conferred a benefit on AT&T when Performers were cleared to provide services on the Series, under terms and conditions permitting AT&T to benefit from the Series.

130.   Unless AT&T is ordered to pay the outstanding Residuals per the terms of the CBA, the Performers will not recover the full value of the additional wages and pension and health contributions they are owed for the services they provided for the benefit of AT&T.

131.   Accordingly, AT&T should not be allowed to retain the benefit derived from the Series, without being responsible for the Residuals due to the Performers who made that benefit possible, and should be ordered to pay restitution and pre-judgment interest, in amounts according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, SAG-AFTRA prays for judgment against Defendants LABC Productions, LLC; DirecTV, LLC; DirecTV Holdings, LLC; DirecTV Enterprises, LLC; The DirecTV Group, Inc.; AT&T Services, Inc.; AT&T Corp.; and AT&T Entertainment Group, jointly and severally liable, specified below:

1.   For an Order compelling Defendants to submit to grievance and arbitration before Arbitrator Adler pursuant to the CBA;

2.   In the alternative, for all outstanding amounts due pursuant to the CBA, including, without limitation, all Residuals, pension and health contributions, and contractually mandated liquidated damages related to AT&T's co-production, financing and distribution of the Series;

3.   In the alternative, for all damages and prejudgment interest, arising from AT&T's co-production, financing and distribution of the Series, promises related thereto, and unjust failure to satisfy the obligations due to the Performers providing services pursuant to the CBA;

4.   For SAG-AFTRA's reasonable attorneys' fees;

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

5.      For costs of suit incurred herein; and

6.      For all such other and further relief as this Court deems just and proper.

DATED:  December 22, 2021          Respectfully submitted,


BUSH GOTTLIEB, A Law Corporation


By: _____
        DAVID E. AHDOOT
        Attorneys for Plaintiff
        Screen Actors Guild-American Federation of
        Television and Radio Artists

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260