1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11   SCREEN ACTORS GUILD-AMERICAN          Case No. 2:21-CV-09879-HDV (MAAx)
     FEDERATION OF TELEVISION AND
12   RADIO ARTISTS, a labor organization
     commonly known as SAG-AFTRA,
13                                          **ORDER DENYING DEFENDANTS' LABC
                    Plaintiff,              PRODUCTIONS, LLC; DIRECTV
14                                          HOLDINGS LLC; DIRECTV
                                            ENTERPRISES, LLC; THE DIRECTV
15   v.                                     GROUP, INC.; AT&T SERVICES, INC.;
                                            AND AT&T CORP'S MOTION TO
16                                          DISMISS PLAINTIFF'S FIRST AMENDED
     LABC PRODUCTIONS, LLC; DIRECTV,        COMPLAINT [DKT. NO. 46]**
17   LLC; DIRECTV HOLDINGS LLC;
     DIRECTV ENTERPRISES, LLC; THE
18   DIRECTV GROUP, INC.; AT&T
     SERVICES, INC.; AT&T CORP.; and AT&T
19   ENTERTAINMENT GROUP,

20                  Defendants.

21

22

23

24

25

26

27

28

1

1

**I.   INTRODUCTION**

2
3
4

This action arises out of events following the production and distribution of the television series entitled "Mr. Mercedes" (the "Series") and centers on residual payments related to the Series requested by Plaintiff SAG-AFTRA.

5
6
7
8
9

Before the Court is a Motion to Dismiss (the "Motion") [Dkt. No. 46] filed by Defendant LABC Productions, LLC ("LABC"), DirecTV, LLC, DirecTV Holdings LLC, DirecTV Enterprises, LLC, and The DirecTV Group, Inc.'s ("Defendants") to dismiss Plaintiff Screen Actors Guild-American Federation of Television and Radio Artists' ("SAG-AFTRA") ("Plaintiff") First Amended Complaint ("FAC") [Dkt. No. 45].

10
11
12
13
14
15
16
17

Specifically, Defendants seek to dismiss the second, fourth, fifth, and six causes of action for all Defendants and first and third causes of action against just Defendants DirecTV, LLC, DirecTV Holdings, LLC, DirecTV Enterprises, LLC, The DirecTV Group, Inc., AT&T Services, Inc. and AT&T Corp.  Defendants argue that the Plaintiff does not make specific allegations against each Defendant sufficient to allege a cause of action and that only Defendant LABC was bound to a production agreement with Sonar Entertainment Productions, LLC ("Sonar"), a producer of the Series and acknowledged signatory to the SAG-AFTRA collective bargaining agreements ("CBA"). Motion at 1–2; FAC ¶ 3.

18
19
20
21

The Court disagrees.  Plaintiff's FAC includes a wide range of new allegations that plausibly show (at least for pleading purposes) that Defendants produced the show subject to the SAG-AFTRA CBA and that each Defendant was involved in production and subject to the Digital Millennium Copyright Act (the "DMCA") and the Labor Management Relations Act (the "LMRA").

22

The Motion is denied.

23

**II.   BACKGROUND**

24

A.  **Factual Allegations**

25
26

On December 20, 2016, Sonar and Defendant LABC entered a "Series Production and License Agreement" ("Production Agreement").  FAC ¶¶ 4, 41.[1]  The Production Agreement

27

28

---

[1] For purposes of this Motion, the Court takes Plaintiff's factual allegations in the FAC as true.

1  transferred "exclusive" copyright interests in the Series to "LABC and its Affiliates" – defined in the

2  Production Agreement as "any corporation, person, or entity controlling, controlled by or under

3  common control with LABC," expressly *including* entities that were referred to generally as

4  "AT&T" and "DIRECTV."  *Id.*  Defendants' arguments center around whether non-LABC

5  defendants constitute "Affiliates" as defined by the Production Agreement.

6         In December 2018, SAG-AFTRA initiated the CBA's grievance and arbitration process after

7  failing to receive residuals with respect to the Series.  FAC ¶ 8.  SAG-AFTRA and Defendants

8  mutually selected an arbitrator to preside over the dispute.  *Id.*  On February 12, 2021, Sonar and

9  SAG-AFTRA reached an agreement concerning the claim, stipulating to its signatory relationship

10  with SAG-AFTRA, that the Series was produced subject to the CBA, and that the total amount of

11  residuals and related amounts due was $4,965,583.40.  FAC ¶ 73.  Several months later, however,

12  Sonar initiated an assignment to liquidate its remaining assets.  FAC ¶ 82.  Arbitration against

13  Defendants continued.  On February 15, 2021, the Defendants submitted their Answer to Plaintiff

14  and filed a cross-complaint against Sonar to claw back payments made, asserting claims for breach

15  of contract, indemnity, and unjust enrichment ("Cross-Complaint") (Exhibit D, Dkt. No. 45-4].

16  After multiple hearings before the arbitrator, Defendants reversed their position on arbitration and

17  refused to recognize the jurisdiction of the arbitrator at the final, pre-hearing conference.  FAC ¶¶

18  10, 102.

19         **B.  Procedural History**

20         In December 2021, Plaintiff filed its initial complaint, commencing this action [Dkt. No. 1].

21  Defendants filed a motion to dismiss, which Plaintiff opposed [Dkts. No. 26, 31].  The Court granted

22  Defendants' motion with leave to amend ("Order") [Dkt. No. 44].  Plaintiff's FAC alleges six claims

23  for relief against all Defendants: to compel arbitration under the DMCA (Claim 1) and the LMRA

24  (Claim 2); failure to pay residuals in violation of the DMCA (Claim 3) and LMRA (Claim 4); failure

25  to pay residuals and to bar Defendants from seeking to recover the partial payments under

26  promissory estoppel (Claim 5); and for restitution under quasi-contract (Claim 6).

27         The Defendants' renewed Motion filed on March 20, 2023 attacks Plaintiff's FAC filed in

28  response to the Court's initial Order.  On April 13, 2023, Plaintiff filed an opposition ("Opp.") [Dkt.

3

1   No. 49].  Defendants filed their reply ("Reply") on April 13, 2023 [Dkt. No. 50].  The Court held

2   oral argument on the Motion on September 7, 2023, and took the matter under submission.

3   **III.    LEGAL STANDARD**

4          Federal Rule of Civil Procedure 12(b)(6) allows a party to seek to dismiss a complaint for

5   failure to state a claim upon which relief may be granted.  "To survive a motion to dismiss, a

6   complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

7   plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

8   *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

9   factual content that allows the court to draw the reasonable inference that the defendant is liable for

10  the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Generally, a court must accept the factual

11  allegations in the pleadings as true and view them in the light most favorable to the plaintiff.  *Park v.*

12  *Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th

13  Cir. 2001).  But a court is "not bound to accept as true a legal conclusion couched as a factual

14  allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A properly pled complaint

15  must "give the defendant fair notice of what the claim is and the grounds upon which it rests."

16  *Twombly*, 550 U.S. at 555.

17  **IV.    DISCUSSION**

18          **A.  DMCA**

19          Defendants seek to dismiss the claims to compel arbitration under the DMCA and the claims

20  for damages under the DMCA against all Defendants except LABC.  Motion at 5–13.

21          The DMCA allows for a court to find that a non-signatory to a CBA assumes the contractual

22  obligations contained therein.  Specifically, the DMCA provides that a "transfer instrument shall be

23  deemed to incorporate the assumption agreements applicable to the copyright ownership being

24  transferred that are required by the applicable collective bargaining agreement, and the transferee

25  shall be subject to the obligations under each such assumption agreement to make residual payments

26  and provide related notice."  28 U.S.C. § 4001(a)(1).

27          To trigger the DMCA's provision, the transferee must "know[] or ha[ve] reason to know at

28  the time of the transfer that such collective bargaining agreement will be applicable to the motion

1    picture."  28 U.S.C. § 4001(a)(1)(A).  The statute defines "knows or has reason to know" as either:

2    (1) "Actual knowledge," (2) "Constructive knowledge," or (3) "Awareness of other facts and

3    circumstances pertaining to a particular transfer from which it is apparent that the collective

4    bargaining agreement was or will be applicable to the motion picture."  28 U.S.C. § 4001(a)(2).

5                                    **i.  Affiliates and Transfer**

6            The initial Order and Defendants' renewed Motion attack Plaintiff's assertions that the non-

7    LABC defendants were affiliates under the Production Agreement between Sonar and LABC.[2]  *See*

8    Order at 2; Motion at 7.  Defendants argue that the FAC fails to allege that "each named Defendant

9    met the appropriate standard of knowing or having reason to know for the DMCA to apply to them."

10   Motion at 7.  In short, Defendants' Motion hinges on their assertion that the non-LABC defendants

11   do not constitute affiliates as defined in the Production Agreement.

12           The Court disagrees, and specifically finds that the FAC has sufficiently added specific

13   factual allegations that adequately allege that each Defendant is an affiliate within the scope of

14   transfer.[3]

15           To start, Plaintiff added allegations connecting the Defendant entities.  All Defendants share

16   the same principal California business address (FAC ¶ 16.a), DirecTV Holdings, LLC and DirecTV

17   Enterprises, LLC share the same managers as LABC (FAC ¶ 16.a), and all Defendants are either

18   subsidiaries of other Defendants (e.g., DirecTV, LLC) or under common control with each other as

19   subsidiaries of the ultimate parent, AT&T Inc.  FAC ¶¶ 17.a, 19.a, 19.a, 20.a, 21.a, and 22.a.  AT&T

20   Inc. was not named as a Defendant, showing that Plaintiff took some care in only including

21

22   [2] Defendants' counsel also conceded at oral argument that Plaintiff asserted enough in the FAC to
     establish the allegation of knowledge under the DMCA by LABC, the only entity that was a
23   signatory to the Production Agreement, but that the non-LABC defendants were not signatories to
     the Production Agreement and not signatories to any CBA documents with respect to SAG-AFTRA.
24

25   [3] The Production Agreement at issue defines "affiliate" as "any corporation, person, or entity
     controlling, controlled by or under common control with LABC."  FAC ¶ 4.  Specifically, "LABC
26   and its Affiliates are…granted the exclusive right…and license…to distribute…and to permit
     distribution and other exploitation…" of the Series.  FAC ¶ 42(a).  Plaintiff added many allegations
27   to the FAC, connecting each Defendant to LABC.  And the Production Agreement specifically
     transfers the copyrights to "LABC and its Affiliates."  FAC ¶¶ 4, 17.c, 42.a, 42.c, 104, 115.
28

1   Defendants plausibly liable for the claims alleged.

2        Moreover, Plaintiff's allegations go beyond the general into concrete connections to the

3   claims against them.  To satisfy Federal Rule of Civil Procedure 8(a), a complaint must "give the

4   defendant fair notice of what the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S.

5   at 555 (citation omitted).  But "[g]roup pleading is not fatal if the complaint still gives defendants

6   fair notice of the claims against them." *Tivoli LLC v. Sankey*, 2015 WL 12683801, at *3 (C.D. Cal.

7   Feb. 3, 2015); *c.f. Sollberg v. Wachovia Sec.*, 2010 WL 2674456, at *4–5 (C.D. Cal. June 30, 2010)

8   (finding "shotgun pleading" against many defendants was "neither plain nor specific" with regard to

9   specifical allegations against each named defendant, "depriv[ing] Defendants of knowing exactly

10  what they are accused of doing").

11       Here, Plaintiff provides specific allegations within the Production Agreement to plausibly

12  allege that other Defendants were affiliates of LABC at the time of the transfer.  For example,

13  Plaintiff alleges that Defendants had ***common representatives*** with knowledge that the Series would

14  use SAG-AFTRA performers before the transfer of copyrights.  FAC ¶¶ 6–7.  And notably, Plaintiff

15  adds that "on October 7, 2017, and prior to the first transfer of copyright in the Production

16  Agreement, Sonar sent DIRECTV and AT&T representatives a production document with a header

17  on the first page that read 'MR. MERCEDES…Pilot…SAG-AFTRA.'"  FAC ¶ 7.  Further, non-

18  LABC Defendants had common representatives controlling the Series' production in specific ways,

19  from casting decisions to processing invoices on behalf of LABC.  FAC ¶¶ 17.b, 18.b, 19.b, 20.b,

20  21.e, 22.e, and 43.

21       Defendants' Motion categorizes Plaintiff's FAC as casting an arbitrarily large net, allowing

22  Plaintiff to argue that "any AT&T or DirecTV entity it chooses to include in the lawsuit is

23  legitimate."  Motion at 17.  Defendants argue that an alter-ego relationship is needed to implicate the

24  other Defendants.  Motion at 18.  But Plaintiff's new allegations demonstrate that it only sued those

25  entities that are connected to the Series and plausibly had a role in its production and distribution.[4]

26  This is sufficient for the pleading stage under Federal Rule of Civil Procedure 8.  *See Heller v.*

27

_____

28  [4] For example, Plaintiff's FAC does not include the parent company, AT&T, Inc.

1   *NBCUniversal, Inc.*, 2016 WL 6573985, at *3 (C.D. Cal. Mar. 30, 2016) (finding group pleading of

2   twelve defendants sufficient to survive motion to dismiss where all named defendants were involved

3   in creation and distribution of the film as "[i]t is not necessary for Plaintiff to allege precisely how

4   the Film was produced, and in what way each producer contributed…."); *accord Mills v. Netflix,*

5   *Inc.*, 2020 WL 548558, at *4 (C.D. Cal. Feb. 3, 2020) (denying motion to dismiss FAC that pleaded

6   allegations against Defendants collectively where it was not "implausible that Defendants each had a

7   role in appropriating, producing, distributing and streaming potions [sic] of Plaintiff's copyrighted

8   work").

9         Indeed, as discussed in *Heller*, "[i]t is not necessary for Plaintiff to allege precisely how the

10   Film was produced and in what way each producer contributed … in order for Defendants to

11   formulate appropriate defenses and conduct meaningful discovery." *Id.* To survive dismissal, SAG-

12   AFTRA must put forth any plausible claim, not the only plausible explanation of events. *See Starr*

13   *v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). It has more than done so here. [5]

14         Defendants' arguments against sufficiency are also undercut when looking at the Cross-

15   Complaint filed in the arbitration proceedings. Defendants filed the Cross-Complaint on behalf of

16   all the AT&T/DirecTV entities seeking indemnification from Sonar for the "Unearned Payment."

17   Cross-Complaint ¶¶ 1–2, 25. While arguing the opposite in this Motion, Defendants brought the

18   Cross-Complaint in arbitration against Sonar on behalf of ***all Defendant entities collectively*** for the

19   $700,000 in payments. The AT&T entities[6] are defined as Affiliates, and the Cross-Complaint treats

20   them as such. *See*, *e.g.*, Cross-Complaint ¶ 18 ("LABC and its affiliates (including AT&T)

21   performed all obligations pursuant to the License Agreement and Amendment."). Further, the same

22   Cross-Complaint alleges that these entities were granted the exclusive right to license the Series. *Id.*

---

23

24   [5] Cases cited by Defendants are inapposite and distinguishable, as this FAC is not a "shotgun" or
"kitchen-sink" complaint. *C.f. Anagnostou v. Cnty. of Los Angeles*, 2020 WL 4919599, at *4 (C.D.
Cal. June 8, 2020) (dismissing FAC where claims "in many instances … [were] conclusory or poorly

25   supported if at all); *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (affirming dismissal in
fraud pleading).

26

27   [6] The Cross-Complaint defines "AT&T" as "Cross-Claimants AT&T Corp., AT&T Entertainment
Group, AT&T Services, Inc., LABC Productions, LLC, DirecTV, LLC, The DirecTV Group, Inc.,

28   DirecTV Holdings LLC, and DirecTV Enterprises, LLC," which constitute all Defendants.

¶ 5 ("Specifically, Producer granted LABC and its affiliates, the exclusive right to license to exhibit *Mr. Mercedes.…*").

The updated FAC alleges that these non-LABC entities were involved in the production of the Series, from casting decisions to promotion of the Series. The fact that Defendants participated for years in the arbitration, brought counter-claims grouping themselves together, and were even added to Sonar's Commercial General Liability insurance covering work performed on the Series, FAC ¶ 16, demonstrates a plausible claim that non-LABC defendants are Affiliates under the Production Agreement. At the summary judgment stage, Plaintiff will certainly have to show who exactly did what, but for now, Plaintiff has met its burden.

In summary, Plaintiff has adequately alleged that non-LABC defendants were affiliates as contemplated within the Production Agreement and are thus subject to the agreement despite being non-signatories, as transferees of the interest in copyright. *See* Order at 2.

### ii.  SAG-AFTRA CBA

Having found that Plaintiff has adequately alleged that all Defendants were subject to the Production Agreement, the next question is whether Plaintiff has sufficiently alleged that each Defendant was aware that the Series would be produced subject to SAG-AFTRA obligations to satisfy the DMCA. 28 U.S.C. § 4001(a)(1)(A) (transferee must "know[] or ha[ve] reason to know at the time of the transfer that such collective bargaining agreement will be applicable to the motion picture."). The Court finds that this requirement has been satisfied. Again, Plaintiff's FAC adds the allegation that on October 7, 2016, before the copyright ownership was transferred to Defendants, Sonar sent common AT&T and DirecTV representatives a production document marking the Series as a SAG-AFTRA covered project. FAC ¶¶ 7, 45. Defendants received a version of the Production Agreement "with a header on the first page that read 'MR. MERCEDES…Pilot…SAG-AFTRA." FAC ¶ 7. This supports the claim that Defendants were *aware* that the production was subject to the CBA. Furthermore, the Production Agreement itself is alleged to contain several references to "guild assumption agreements" and descriptions of "Guild Payment Obligations." FAC ¶¶ 6, 42.b. These additional allegations are enough to demonstrate "[a]wareness of other facts and circumstances pertaining to a particular transfer from which it is apparent that the collective

1   bargaining agreement was or will be applicable to the motion picture." 28 U.S.C. § 4001(a)(2).

2   Finding otherwise would require the Court to assume that these other Defendants simply ignored this

3   version of the Production Agreement and accept as plausible that **only** LABC was aware that the

4   Series was covered by a SAG-AFTRA CBA.  It is simply too early to adjudicate this important

5   requirement one way or the other, as SAG-AFTRA cannot have known the boundaries of each

6   Affiliated entities' interrelated conduct.[7]  The pleadings here are enough.

7                          iii.   **Public Performance Exception**

8          Defendants also moves to dismiss the DMCA claims on the basis that the DMCA does not

9   apply to public performance rights.  28 U.S.C. § 4001(a); Motion at 11–13.  But 28 U.S.C. §

10  4001(b), which specifies the scope of the public performance exception, excludes transferees that

11  also function as either a distributor or a producer of a motion picture.  The statute specifies that

12  "when a terrestrial broadcast station, cable system, or programmer, or other transferee, is also

13  functioning as a distributor or as a producer of the motion picture, the public performance exclusion

14  does not affect any obligations imposed on the transferee to the extent that it is engaging in such

15  functions."  28 U.S.C. § 4001(b).

16         Here, Plaintiffs have added many plausible allegations in the FAC that Defendants

17  functioned as producers and distributors of the Series.  FAC ¶¶ 16–23, 42–46.  The Production

18  Agreement specifically allowed "LABC and its Affiliates "exclusive right … to distribute" the

19  Series.  FAC ¶ 42.a.  And on the production side, Plaintiffs allege that Defendants "exercised their

20  control over casting decisions," managed shoot schedules, controlled press releases, controlled visual

21  and creative elements, and had control of production credits and branding.  FAC ¶ 43.  Because

22  Plaintiff has alleged facts that Defendants acted as producers and distributors of the Series, the

23  public performance exception cannot support the motion to dismiss at this stage.  28 U.S.C. §

24  4001(a).

25

26  ───────────────

    [7] During the arbitration process, SAG-AFTRA alleges that it issued requests for information
27  concerning the relationships among the Defendants, other potential Affiliate entities, and the Series,
    FAC ¶ 25, but Defendants failed to respond to the requests and instead produced documents, FAC ¶
28  92, which Plaintiff has reviewed.  Opp. at 10.

1    **B.  LMRA**

2        Section 301 of the LMRA provides a federal cause of action for "[s]uits for violation of

3    contracts between an employer and a labor organization.…" 29 U.S.C. § 185(a).  Plaintiff's FAC

4    alleges that Defendants are bound to certain provisions of the CBA and liable for unpaid residuals

5    under LMRA.  FAC ¶¶ 111–118, 124–128. Defendants argue that these LMRA claims (claims two

6    and four) fail because (1) there is no written agreement between the parties, and (2) Defendants are

7    not employers as defined in by the LMRA.  Motion at 13–19.

8        Defendants' Motion is wrong both on the facts and on the law.

9        First, the LMRA does not explicitly require a written agreement between Plaintiff and

10   Defendants.  As the Court noted in its initial Order, Plaintiff's claims under the DMCA and LMRA

11   (and its promissory estoppel and quasi-contract claims) do not require a written agreement between

12   Plaintiff and the Defendants.  Order at 3; *see e.g. Smoke Tree*, 2011 WL 13272696 at *9 (finding that

13   the plaintiff had established liability under the DMCA even though the defendants were not

14   signatories to the CBA); *Am. Fed'n of Musicians v. Rural Media Grp., Inc.*, 2021 WL 848699 at *3

15   (M.D. Tenn. Mar. 5, 2021) (same); *id.* at *2–4 (finding that "there is no categorical rule that only

16   signatory employers may be sued under the LMRA" and rejecting the view that "[a]ny LMRA claim

17   would only be permitted against the original employer, even if that employer had fully sold away its

18   copyright rights and, with them, its ongoing ability to profit off the subject work").  Further, the

19   FAC alleges that Defendants benefited from arbitration procedures provided by the CBA for nearly

20   two years, submitting disputes to the arbitrator, demanding productions of records from SAG-

21   AFTRA, and asserting counter-claims against SAG-AFTRA with the expectation that such counter-

22   claims would be heard by the arbitrator.  FAC ¶¶ 61–102; *see S. California Painters & Allied Trade*

23   *Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1131–33 (9th Cir. 2004) (recognizing

24   that a non-signatory to a CBA can adopt a labor agreement by conduct); *see also Bd. Of Trustees of*

25   *the Bay Area Roofers Health & Welfare Tr. Fund v. Gudgel Yancey Roofing Inc.*, 225 F. Supp. 3d

26   1106, 1111–12 (N.D. Cal. 2016) (noting that non-signatories can adopt a CBA by "conduct

27   manifesting an intention to abide by the terms of the agreement," including "submission … to union

28   jurisdiction, such as that created by grievance procedures").

10

1    Second, the LMRA does not require that Defendants come within the statutory definition of

2    "employer." "[I]t is well settled that parties in a § 301 action do not necessarily have to be employers

3    or labor organizations.  The word 'between' in § 301(a) refers to 'contracts' between an employer

4    and a labor organization, not to 'suits' between them." *Painting & Decorating Contractors Ass'n of*

5    *Sacramento, Inc. v. Painters & Decorators Joint Comm. of E. Bay Ctys., Inc.*, 707 F.2d 1067, 1070

6    n.2 (9th Cir. 1983).

7    As previously discussed, the FAC provides multiple allegations plausibly linking each

8    Defendant to the Series based on their conduct and the terms of the Production Agreement.

9    Defendants' contention that the LMRA claims fail because "Plaintiff has provided no evidence that

10   each named Defendant had knowledge of the collective bargaining agreement between Sonar and

11   Plaintiff or the License Agreement between Sonar and LABC" (Reply at 10) is unpersuasive

12   Plaintiff has more than adequately alleged based on the language of the parties' agreements that the

13   Production Agreement was subject to the CBA and granted "LABC and its Affiliates," which

14   include the Defendants, the "exclusive right … and license … to distribute" the Series."  FAC ¶ 42.a.

15   Plaintiff's amended claims sufficiently and plausibly allege LMRA violations.[8]

16       **C. Promissory Estoppel**

17   Defendants also seek to dismiss Plaintiff's Fifth Cause of Action for Promissory Estoppel.

18   Motion at 19.  To plead a promissory estoppel claim, Plaintiff must allege five requirements: (1) the

19   existence of a promise, (2) which the promisor reasonably should have expected to induce the

20   promisee's reliance, (3) which actually induces such reliance, (4) that such reliance is reasonable,

21   and (5) that injustice can only be avoided by enforcement of the promise." *Aguilar v. Int'l*

22   *Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 445 (9th Cir. 1992).  As noted before, the Court

23   ruled that "plaintiff's promissory estoppel and quasi-contract claims do not require a signed written

24   agreement between plaintiff and defendants."  Order at 3.

25   Plaintiff sufficiently alleges each element in the FAC.  First, common representatives of the

26

27   [8] The Court finds that Plaintiff's amended claims also provide ample bases to compel arbitration
     under Claims 1 and 2, as Plaintiff has sufficiently pled that the DMCA and LMRA apply to the
28   named Defendants.

11

1    Defendants specifically promised SAG-AFTRA that the CBA obligations would be satisfied.  FAC

2    ¶¶ 47–48, 51, 53, 55.  The existence of this alleged promise can be inferred most directly (at least for

3    pleading purposes) from Paragraph 47 of the FAC, which essentially states that, when Plaintiff

4    sought payment of "Residuals required under the CBA" the "AT&T Service Representative

5    responded to the Claim by acknowledging receipt" and during the production of the Series, "this

6    same AT&T Services Representative also processed invoices related to the Series on LABC's

7    behalf."  FAC ¶ 47.

8         Second, Defendants foreseeably induced SAG-AFTRA to reasonably rely on that promise by

9    engaging a payroll company to process subsequent residuals payments to the performers.  FAC ¶¶

10   51, 53.  And "[o]n February 13, 2020, the AT&T Services Representative informed SAG-AFTRA

11   that their new point of contact would be the Head of Current Programming and Production within

12   the AT&T Entertainment Group, an individual who also operated on behalf of DIRECTV," making

13   assurances to SAG-AFTRA via email "that payment would be forthcoming, representing that the

14   delay was the fault of the Payroll Company."  FAC ¶ 53.

15        Third, in reliance of the Defendants' promise to satisfy the CBA, Plaintiff agreed to several

16   procedural delays, which plausibly caused Plaintiff to not escalate its claim against Sonar.  FAC ¶¶

17   47, 49, 53–54, 55, 57, 60.  Specifically, in September 2020, "SAG-AFTRA allowed the Defendants

18   additional time to consider and participate in arbitrator selection."  FAC ¶ 57.

19        Fourth, Defendants' alleged statements sufficiently demonstrate for pleading purposes that

20   Plaintiff's reliance was reasonable, as Defendants' representatives made assurances that payments

21   would be made.  FAC ¶ 55.  For example, in August 2020, "the AT&T/DIRECTV Representative

22   asked SAG-AFTRA to delay arbitrator selection, stating in an email that it was 'right at the goal

23   line' for paying Residuals for the Series."  FAC ¶ 55.

24        And lastly, Plaintiff meets the fifth element by plausibly alleging that injustice can only be

25   avoided by enforcement of the promise.  In May 2021, Sonar became insolvent, initiating a

26   liquidation of assets.  FAC ¶ 82.  Without such delays, Plaintiff alleges that Sonar could have been

27   able to satisfy the total residuals obligation.  FAC ¶ 82, 134.

28

1

### D. Quasi-Contract

2       To assert a claim for quasi-contract, the allegations must demonstrate receipt of a benefit and

3 unjust retention of the benefit at the expense of another. *Astiana v. Hain Celestial Grp., Inc.*, 783

4 F.3d 753, 762 (9th Cir. 2015). Here, SAG-AFTRA alleges that Defendants entered into the

5 Production Agreement with knowledge that the Series would be produced subject to a SAG-AFTRA

6 CBA (FAC ¶¶ 3–4, 7), exercised control over casting to ensure SAG-AFTRA-represented

7 performers would provide their services, and collectively benefited from the economic success of the

8 Series. FAC ¶¶ 43, 42.f. Taking the allegations of the FAC as true, as the Court must for purposes

9 of this Motion, Defendants' ostensible avoidance of its union obligations resulted in unjust

10 enrichment at the expense of performers who are entitled to additional compensation in the form of

11 residuals. Plaintiff's claims constitute a "straightforward statement" that is "sufficient to state a

12 quasi-contract cause of action." *Astiana*, 783 F.3d at 762.

13       Defendants' Motion seeks dismissal of this claim on the ground that a valid contract exists.

14 Motion at 21. Under California law, "unjust enrichment is an action in quasi-contract, which does

15 not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor*

16 *Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *see also Lance Camper Mfg.*

17 *Corp. v. Republic Indem. Co.*, 51 Cal. Rptr. 2d 622, 628 (Cal. App. 1996) ("[I]t is well settled that an

18 action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties

19 a valid express contract covering the same subject matter.").

20       But Plaintiff's claim for restitution under quasi-contract "is pled in the alternative," and "[a]s

21 to each Defendant," "is limited to circumstances in which it is deemed that no contract between

22 SAG-AFTRA and that Defendant governs that Defendant's obligation to pay Residuals to the

23 Performers." FAC ¶ 137; *see also Veritas Techs. LLC v. Cushman & Wakefield, Inc.*, 2022 WL

24 222527, at *11 (N.D. Cal. Jan. 25, 2022) (denying motion to dismiss claim where plaintiff "pled the

25 unjust enrichment claim in the alternative and limited its application to circumstances in which the

26 [contract] was void and unenforceable). Plaintiff's claim is properly limited and sufficient to survive

27 a motion to dismiss.

28

1

**V.     CONCLUSION**

2        For the foregoing reasons, the Court concludes that Plaintiff has sufficiently pled facts

3 supporting its claims for relief, and on that basis denies the present Motion in its entirety.

4        **IT IS SO ORDERED.**

5 Dated:    October 20, 2023

6                                                    _____

7                                                          Hernán D. Vera
                                                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14